UNITED STATES v. OSCAR E. EGGEN (AMERICAN EXPRESS CO.) ET AL. (No. 5276)**

United States Court of Customs and Patent Appeals, June 13, 1968

*Edwin L. Weisl, Jr.*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section, *Bernard J. Babb* for the United States.

*Glad & Tuttle* (*Edward N. Glad*, of counsel) for appellees.

[Oral argument April 1, 1968 by Mr. Babb and Mr. Glad]

Before WORLEY, Chief Judge, and Judges RICH, SMITH, ALMOND, KIRKPATRICK*

SMITH, Judge, delivered the opinion of the court:

This appeal by the Government requires determination of whether,

*Senior District Judge, Eastern District of Pennsylvania, sitting by designation.
**C.A.D. 939.

as a matter of law, there is substantial evidence in the record to support the judgment of the Customs Court [1] holding that the proper basis for appraisement of certain imported ball bearings in inch-size dimensions is the "cost of production" in the amounts contended for by the importer.

The dispute arises under section 402a of the Tariff Act of 1930, 46 Stat. 708, as amended by the Customs Simplification Act of 1956, 70 Stat. 943, because ball bearings and parts thereof appear in the final list of articles designated by the Secretary of the Treasury in T.D. 54521, as provided for in section 6(a) of the Customs Simplification Act. Section 402a, in pertinent part, provides:

SEC. 402(A) VALUE (ALTERNATIVE).

(a) *Basis.*—For the purpose of this Act the value of imported articles designated by the Secretary of the Treasury as provided for in section 6(a) of the Customs Simplification Act of 1956 shall be—

(1) The foreign value or the export value, whichever is higher;

(2) If the appraiser determines that neither the foreign value nor the export value can be satisfactorily ascertained, then the United States value;

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) If the appraiser determines that neither the foreign value, the export value, nor the United States value can be satisfactorily ascertained, then the cost of production;

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) *Foreign Value.*—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(d) *Export Value.*—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(e) *United States Value.*—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transpor-

---

[1] *United States* v. *Oscar E. Eggen* (*American Express Co.*) *et al.*, 57 Cust. Ct. 736, A.R.D. 212 (1966).

tation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

(f) *Cost of Production.*—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

\*        \*        \*        \*        \*        \*        \*

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

The imported ball bearings, in inch-size dimensions, were imported from West Germany at various times during 1959. These inch-size ball bearings [2] were denominated as of the R series, designated generally as R2″, R3″ and R4″ with additional identification not material here. They were appraised on the basis of foreign value under section 402a (c) above. The appraised values were originally upheld by a single judge.[3] Rehearing was then granted with additional evidence being introduced. On rehearing, the trial judge found [4] cost of production to be the proper basis for appraisement and the resulting judgment was affirmed by the United States Customs Court, Third Division, Appellate Term, in the judgment here on appeal.

In attacking the appraised values, appellees' burden of proof was twofold: To prove the action of the appraiser erroneous and to establish affirmatively the correct dutiable value. *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593 (1955); *H. S. Dorf & Co., Inc.* v. *United States*, 41 CCPA 183, C.A.D. 548 (1954); *Kenneth Kittleson* v. *United States*, 40 CCPA 85, C.A.D. 502 (1952). Thus, appellees had the task of disproving the existence of the values given priority over cost of production by section 402(a), particularly including foreign value. It also had the responsibility of proving that its figures for cost of production were correct.

The Appellate Term agreed with the trial court on rehearing that appellees had, through the evidence in the record, sustained that burden of proof. Thus, it found they had successfully negatived the exist-

---

[2] The term "inch size" ball bearings refers to ball bearings in dimensions of fractions of an inch as contrasted to ball bearing in millimeter dimensions according to the metric system. The designations R2," R3" and R4" refer to bearings having internal diameters of $\frac{1}{8}$ inch, $\frac{3}{16}$ inch and $\frac{1}{4}$ inch, respectively.

[3] *Oscar B. Eggen (American Express Co.) et al.* v. *United States,* 46 Cust. Ct. 694, R.D. 10013 (1961).

[4] *Oscar B. Eggen (American Express Co.) et al.* v. *United States,* 54 Cust. Ct. 508, R.D. 10901 (1965).

ence of foreign, export, and United States values for the imported merchandise and had also proved their claimed dutiable values for cost of production. The record on which that conclusion was based includes the record as originally made, consisting of the testimony of the importer, Oscar E. Eggen, an affidavit of Michael Groh, export manager of the German firm which manufactured the merchandise, samples of the merchandise and a report of a customs representative. On rehearing, there was added testimony of the same Michael Groh, testimony of another importer of German bearings, an affidavit of Groh [5] and affidavits of various other witnesses in Germany.

The Government contends that the appraisement based on foreign value should be upheld. It identifies the specific contentions it relies on here by setting out the issues as:

1. The Third Division, Appellate Term erred in finding and holding that the imported inch-size bearings were not similar to the metric-size bearings which were freely offered for sale to all purchasers for home consumption in Germany.

2. The Third Division, Appellate Term erred in finding and holding that the appellees successfully established that there was no United States value for similar merchandise.

3. The Third Division, Appellate Term erred in finding and holding that appellees had proved their claimed dutiable values on the basis of cost of production.

Thus, appellant does not question that appellees have proved the absence of foreign, export, and United States value for *such* merchandise.

█ Our review in reappraisement cases is upon questions of law only. Therefore, the matter for determination here, as set out hereinabove in our initial statement of the case, is whether the findings below are supported by any substantial evidence in the record. *United States v. Getz Bros. & Co.*, 55 CCPA 11, C.A.D. 927 (1967). It is not our province to weigh the evidence. *United States v. North American Asbestos Corp.*, 48 CCPA 153, C.A.D. 783 (1961). Appellant's arguments urging error below must therefore be evaluated on this basis.

Appellant's contention that there is a foreign value for the imported inch-size bearings [6] rests on the position that the imported bearings are *similar* to metric-size bearings offered for sale to all purchasers for home consumption in Germany.

The trial judge stated that three questions are to be considered in making a determination of similarity, those questions being (1) whether the articles are made of approximately the same material, (2) whether they are capable of or adapted to the same use and could be substituted one for another, and (3) whether they are of the same ap-

---

[5] The *second* Groh affidavit was *submitted after* Groh had *testified and returned to* Germany.

[6] The record establishes that metric-size bearings were used substantially exclusively in Germany.

proximate commercial value. The judge found the evidence to establish that the metric-size and inch-size bearings here were of approximately the same material, that the two kinds of bearings were not interchangeable [7] and that the cost of production of inch-size bearings produced in Germany was approximately 20 percent higher than that of metric-size bearings. He was satisfied from the absence of interchangeability and from the higher cost of the inch-size bearings that the two types of bearings were not similar for appraisement purposes.

Two of the judges of the Appellate Term agreed with the trial judge that metric-size and inch-size bearings were not interchangeable and relied on that factor in finding that the bearings were not similar for appraisement purposes. In a concurring opinion, the third judge agreed that there was not mechanical interchangeability but found that commercial interchangeability did exist, relying largely on *United States* v. *Thomas & Co.*, 21 CCPA 254, T.D. 46788 (1933). She concluded that the bearings were dissimilar, however, "because of the proven wide variation in costs."

The *Thomas* case is also relied upon here by appellant. That case involved certain paper tubes and bobbins imported from Czechoslovakia which were used to hold yarn during spinning. The question there was whether the imported goods were similar for appraisement purposes to tubes and bobbins sold in Czechoslovakia. The evidence showed that the various tubes and bobbins differed in the number of corrugations and varied in diameter and taper although they did not vary in price. Certain American and Czechoslovakian manufacturers "could not use on their particular spindles tubes having a taper not designed to fit the spindle of their machines" but "others, there and here, could use tubes with such a taper." The court found that the imported tubes, made to order in accordance with the samples or specifications, were sufficiently similar to those sold in Czechoslovakia for appraisement purposes.

We think the fact that *some* of the imported and home market articles were interchangeable and that there was no difference in commercial value in *Thomas*, results in a clear distinction between it and the present case. The evidence here plainly supports the conclusion in the principal opinion of the Appellate Term that there is "a complete lack of possible substitution and adaptability for use of the inch-size bearings in the stead of the metric-size bearings used in Germany."

Legal support for the finding of dissimilarity is found in two cases

---

[7] The witness Eggen testified that metric-size bearings cannot be substituted for inch-size bearings because the dimensions are different and that he had never sold metric-size bearings to one who used inch-size bearings. The other two witnesses gave similar testimony.

cited by the Appellate Term, *United States* v. *Kraft Phenix Cheese Corp.*, 26 CCPA 224, C.A.D. 21 (1938) and *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. App. 19, T.D. 42714 (1928). *Kraft Phenix* involved two kinds of Roquefort cheese manufactured in France, "Standard" Roquefort and "Portion" Roquefort. The "Standard" Roquefort, which was sold in France for home consumption, commanded a higher price because of its method of manufacture and was difficult to cut without crumbling. The "Portion" Roquefort was manufactured by different treatment and curing to have a firmer texture and less mold so as to be capable of being cut into wedge-shaped pieces as marketed in the United States with little or no crumbling. The issue was whether the imported "Portion" Roquefort was similar to the "Standard" Roquefort sold in the home market in France and for which a foreign value was established. This court held that the two Roquefort cheeses were dissimilar even though the ultimate use of both was the same in the broad sense that "[t]hey are both eaten as Roquefort cheese."

The *Massin* case involved black silk hatter's plush. A plush sold in the home market in Germany and for which a foreign value was conceded, was far superior both in finish and construction to that imported. In considering whether the two plushes were similar, the court stated, 16 Ct. Cust. App. at 25 :

* * * if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used ordinarily, they are similar * * *.

While the Court commented that the differences in construction of the two plushes might not be so great as to prevent the fabrics from being considered similar, it found the testimony to show that they could not be used for the same purpose and ruled they were not similar.

The Appellate Term also cited *United States* v. *Wecker & Co.*, 16 Ct. Cust. App. 220, T.D. 42837 (1928). That case involved cotton velveteen appraised at foreign value on the basis that similar merchandise was freely offered for sale to all purchasers in the principal markets in the country of exportation. There was evidence that the velveteen sold in the home market was of better quality than the imported product and that the latter was not commercially interchangeable and would not be accepted as good delivery on an order for the home market product because it was lighter, had less pile and poorer finish, was not dyed as well and was made of cheaper materials. The court, following the *Massin* case, sustained the lower court's finding of dissimilarity while emphasizing that one pile was not a substitute for the other.

A more recent decision pertinent here is *B. A. McKenzie & Co., Inc.*

v. *United States*, 47 CCPA 143, C.A.D. 748 (1960). Involved in that case was the question whether certain rifles sold in Sweden, denominated Brno rifles, were similar to certain other rifles, known as Husqvarna rifles, which were imported to the United States from Sweden. The record showed that both rifles were bolt-action, five-shot repeater, sporting rifles of the Mauser type and shared other common features. However, the rifles differed in several respects, including the sights and bolt handles. In concluding that the rifles were not similar for appraisement purposes, the court stated, id. at 147:

Although appellants' witnesses testified that the apparent difference in the length of the barrel and the caliber of the rifles would not affect their prices, these specific differences, as well as the other differences noted, are undoubtedly important to the individual sportsman and as such are significant in determining the question of commercial interchangeability, which is one of the factors to be considered in ascertaining whether the merchandise is similar within the purview of section 402(c). [Citations omitted.]

Appellant questions the significance of the evidence presented on the matter of price differential between inch-size and metric-size bearings. It notes that testimony in the record regarding a 20 percent greater price for inch-size bearings broke the total down into 10 percent due to factors arising from lower production of inch-size bearings, 6 or 7 percent due to difference in the form of packing and 3 percent attributable to a special lubricant employed. While we recognize that the latter two elements might not be based on differences in the bearings themselves, we think that a difference in price or cost due to differences in quantities produced by the manufacturer cannot ordinarily be ignored in determining the question of similarity. However, we do not consider the question of price differential in itself to be of any great significance here. Rather, the evidence that the bearings are not mechanically or commercially interchangeable clearly amounts to substantial evidence to support the Appellate Term's conclusion of dissimilarity. See *C. J. Tower & Sons* v. *United States*, 50 CCPA 76, C.A.D. 824 (1963).

On the question of export value under section 402a(d), the Appellate Term found the record to establish, 57 Cust. Ct. at 746:

* * * that inch-size bearings manufactured in Germany for export to the United States are restricted to particular parties in the United States. It appears that the three firms listed below were the only manufacturers known to produce inch-size bearings.

The testimony of Mr. Groh clearly establishes the restriction of sales by GMK

2. Kugelfischer Georg Schafer & Co., hereinafter referred to as KGS.

3. Gebruder Reinfurt.

The testimony of Mr. Groh clearly establishes the restriction of sales by GMK of inch-size bearings to the United States.

The affidavit of Kurt Göttel stands unrebutted as to the fact that KGS does

not manufacture inch-size bearings of this R series, ranging from R2 to R8, involved herein. The affidavit of Heribert Leisaner establishes that the firm of Gebruder Reinfurt sold to only one selected purchaser in the United States in the year 1959, involved herein.

On the basis of those findings, the court held the evidence "sufficient to negate the existence of export value for such or similar merchandise. We hold that there is substantial evidence to support that conclusion, although such determination may be unnecessary as a result of the apparent failure of appellant to continue reliance on export value.

With respect to the question of United States value, the Appellate Term again referred to the evidence that KGS never manufactured bearings in the R series ranging from R2'' to R8'' and also relied on a statement in the affidavit of Leisaner that the inch-size bearings made by GMK, the manufacturer of the involved bearings, were not produced by any other German manufacturer. It found the evidence satisfactorily established that there was no United States value for similar merchandise.

Appellant argues that the evidence shows that inch-size bearings of other than the R series from R2'' to R8'' were exported to the United States in 1959 by KGS and Gerbruder Reinfurt. It urges that it was incumbent upon appellees to establish either that such inch-size bearings imported by other German manufacturers were not similar to the instant imported inch-size bearings or that they were not freely offered for sale to all purchasers in the United States for domestic consumption. In answer to that contention, we think it is plain that the Appellate Term was satisfied that any such inch-size bearings that may have been imported were not similar to the involved bearings of the R series from R2'' to R4''. Such conclusion is supported by appellees' evidence, particularly in the absence of any rebuttal evidence as to the size and use of the KGS and Gebruder Reinfurt bearings to which appellant refers. The finding of no export value is therefore supported by substantial evidence.

■ Since neither the foreign value as appraised nor any other value advanced by appellant is applicable to the involved inch-size bearings, proper basis for appraisement is cost of production as contended by appellees. The sole remaining question thus becomes whether appellees have satisfied their burden of establishing the amount of that value.

Appellees' evidence on that point includes the first affidavit of Groh, which sets out figures for the various components of cost of production under section 402a(f) for the imported inch-size bearings. Also in point is Groh's second affidavit. There he stated that he had contacted five ball bearing manufactures in Germany, including two other firms that manufactured inch-size bearings, and that each declined to disclose any data relating to ther profits in 1959.

Appellant recognizes that where sufficient and diligent efforts are made to ascertain the profit ordinarily added by other manufacturers and such efforts are unsuccessful, "then proof of the manufacturer's profits is acceptable." However, it states:

> Even aside from the sufficiency of the proof regarding appellee's efforts to ascertain the profits of other manufacturers, there is clearly a deficiency of proof relating to the element of profit. Georg Müller Kugellager-Fabrik, in 1959, produced and sold metric-size bearings as well as inch-size bearings, as disclosed by the evidence herein. If metric-size bearings comparable to the imported inch-size bearings are not similar for the purposes of foreign value, they most certainly fall within the broader category of merchandise of the same general class or kind as that involved herein. Certainly, such information regarding the profit realized on the sale of the metric-size bearings, which might be higher than the profit realized on the sale of the inch bearings, and higher than the statutory minimum, is pertinent on the question of profit ordinarily added, and is within the bosom of the exporter herein. Yet, no evidence was proffered by the appellees regarding the profit ordinarily added by the exporter in the sale of metric-size bearings. This patent deficiency is regarded by appellant as fatal to appellees' cause, and it was, for this reason alone, reversible error for the lower court to have held that appellees had satisfied their burden of proving their claimed values on the basis of cost of production.

Appellant further points to the fact that the appraised values of the merchandise were much higher than the cost of production contended for by appellees even though it is claimed that the cost of production of inch-size bearings is greater than that of metric-size bearings in the same size range. Stating that "it is presumed that the Appraiser found this [appraised] price to be the home market price for a comparable metric-size bearing," appellant asserts that the explation of the price difference *"could* be that the profit realized on the sale of metric-size bearings was considerably higher than on the sale of inch-size bearings."

Appellees' evidence of unsuccessful efforts to learn the profits of other manufacturers clearly complies with the requirements for excusing the production of such information as set out in *United States* v. *Jovita Perez*, 36 CCPA 114, C.A.D. 407 (1949). In addition, we note that appellant's challenge to the figures for profits submitted by appellees is based merely on conjecture that those figures do not correspond to the profits realized on the manufacturer's overall production of "merchandise of the same general character." Appellant has itself submitted no evidence to show that the manufacturer obtained a different profit on metric-size bearings which might be "of the same general character" as the imported bearings. Moreover, the record here does not reveal that this argument with respect to the profit on metric-size bearings was made before the Customs Court and the question is not discussed in any of the opinions below. Under these particular

circumstances, we find no basis for disagreeing with the contention made by appellees that this is a situation where, under the *Jovita Perez* case, "the profit usually added is the profit actually added."

In our opinion, there is substantial evidence to support the finding of the Appellate Term.

The judgment is *affirmed*.